UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

_____

JOE O'BRIEN,

                Plaintiff,                        Case No. 2:13-cv-131

v.                                                        Honorable R. Allan Edgar

MICHIGAN DEPARTMENT
OF CORRECTIONS, et al

                Defendants.
_____/

## OPINION

        This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*, and Plaintiff has paid the initial partial filing fee. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

**Factual Allegations**

Plaintiff Joe O'Brien, a state prisoner currently confined at the Newberry Correctional Facility, filed this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Michigan Department of Corrections, Corizon Health, Inc., Regional Medical Officer William Borgerding, Dale E. Asche, M.D., Lizabeth Ralles, M.D., Jeffrey W. Bomber, M.D., Richard D. Russell, M.D., Lorenz P. Kielhorn, M.D., Joshua Schad, R.N., Unknown Shullick, M.D., Aster Berhane, M.D., and Garcia Clinical Laboratory, Inc.

In Plaintiff's complaint, he alleges that in 1997-1998, while on active duty in the United States Marine Corps, he was diagnosed as having Hypogonadotropic Hypogonadism[1] (HH). Plaintiff asserts that HH causes a deficiency in testosterone, which can cause decreased libido, erectile dysfunction, a decline in cognitive skill, awareness, and brain function, sleep disturbance, vasomotor instability, drastic mood swings, depression, anger, decreased lean body mass, increased visceral fat, testicular atrophy, gynecomastia, and nutritional deficiencies. In addition, testosterone deficiency increases the odds of coronary artery disease.

Plaintiff states that during the initial stages of his treatment in 1997-1998, he received testosterone injections and HCG [human chorionic gonadotropin] three times per week for over a year. Plaintiff alleges that this therapy was successful in developing his testis to a "functional" size. Thereafter, Plaintiff received testosterone injections as a maintenance program. In 2010, while Plaintiff was in quarantine at Jackson Prison, he was told by medical staff that "all" hormonal

---

[1]Hypogonadotropic hypogonadism (HH) is a form of hypogonadism that is due to a problem with the pituitary gland or hypothalamus. *See* http://www.nlm.nih.gov/medlineplus/ency/article/000390.htm.

- 2 -

treatment would start at Plaintiff's primary facility, and that because his hormonal therapy had begun prior to his incarceration, it would be continued.

Plaintiff arrived at the Newberry Correctional Facility (NCF) on February 25, 2010, and filed a health care request form. Plaintiff was told that he would be seen no later than March 4, 2010. Plaintiff made another health care request on March 22, 2010, and on March 25, 2010, Defendant Bomber ordered weekly testosterone injections. Plaintiff claims that there were errors in the injections and that it wore off very quicky, causing him to suffer from migraines. On April 8, 2011, Plaintiff kited health services to see why his medical call-out had been cancelled. Plaintiff was told that he would be seen on April 8, 2011. On April 11, 2011, Plaintiff was rescheduled for a medical call-out because his medication was not available.

On April 12, 2011, Plaintiff filed a grievance regarding the deprivation of his testosterone injections. The step I response to the grievance indicated that the medication had expired and that blood work would be ordered at the end of April. The May 5, 2011, step II response indicated that blood work had not yet been completed. On May 21, 2011, Plaintiff filed a health care request, complaining that he had not received a testosterone injection in either April or May. On June 28, 2011, Plaintiff filed a health care request, seeking to be seen by Defendant Bomber and an endocrinologist.

On July 11, 2011, Defendant Shullick went over Plaintiff's lab results with him, and told Plaintiff that the results were "ideal." Plaintiff pointed out that he had begun receiving weekly injections again. Defendant Shullick ordered a follow-up blood draw, which was taken a few days after Plaintiff received a testosterone injection, causing the results to be at a peak level. However, Defendant Shullick refused to discuss the matter with Plaintiff. On July 18, 2011, Plaintiff submitted

a health care request to see Defendant Bomber and an endocrinologist, to no avail. On July 21, 2011, Plaintiff filed a grievance asserting deliberate indifference to a serious medical need. In the grievance, Plaintiff complained about being switched to weekly injections based on lab results which indicated that his labs were "ideal." Plaintiff wished to be maintained on the treatment plan which had been implemented prior to his incarceration. Plaintiff also asked to be seen by Defendant Bomber.

On August 8, 2011, Plaintiff was seen by Defendant Bomber and lab work was ordered. Plaintiff discussed his concerns regarding peaks and lows in his testosterone levels and Defendant Bomber told him that he would go over the lab results and reschedule an appointment for August 29, 2011. On August 15, 2011, Plaintiff received a response to his grievance, which indicated that the current medical plan was therapeutic and that Plaintiff had been referred to Defendant Bomber. On August 22, 2011, Plaintiff filed a step II appeal seeking continued weekly injections, even if the dosage needed to be divided. The step II response indicated that Defendant Bomber had been consulted regarding the best approach to achieve target testosterone levels.

On September 12, 2011, Plaintiff submitted a health care request for an appointment with Defendant Bomber. On October 10, 2011, Plaintiff filed another health care request seeking to have his follow-up appointment with Defendant Bomber, stating that he was still suffering from migraines and other discomfort. On October 14, 2011, Plaintiff did not receive his scheduled injection, so he filed another grievance against Defendants Shullick and Bomber asserting deliberate indifference. On October 25, 2011, Plaintiff received a response to his grievance, stating that Plaintiff's medication was due to expire, labs had been requested, and that treatment had been deferred. Plaintiff filed a step II appeal and on November 4, 2011, he received a response which

indicated that his weekly testosterone injections had a stop date of January 20, 2012. Plaintiff filed health care kites on October 31, 2011, November 6, 20, and 25, 2011, complaining that he continued to suffer "hormonal imbalance issues." On November 27, 2011, Plaintiff wrote a letter to Defendant Berhane regarding staff's failure to give him weekly injections. On November 28, 2011, Plaintiff's step III grievance appeal was denied.

On November 30, 2011, Plaintiff filed a grievance asserting deliberate indifference by Defendants Shullick, Berhane, and Borgerding. Plaintiff claims that their actions caused delays in his treatment for over two months, which caused Plaintiff to suffer a hormonal imbalance. On December 18, 2011, Plaintiff filed a health care request. Plaintiff fails to allege what, if any, response he received. On December 20, 2011, Plaintiff received a step I response to his grievance, which stated that all medication was being deferred until new blood work could be drawn. According to Plaintiff, the response also stated that the Regional Medical Officer "does not make changes based on new blood work, but old Extreme low testosterone reading and reference range changes Garcia Labs needs to be questioned." On December 27, 2011, Plaintiff filed a step II grievance appeal, asserting that the step I response was misleading. Plaintiff stated that health services failed to reschedule his appointment after they instructed Plaintiff to return to his unit and failed to take responsibility for denying Plaintiff his medication. Plaintiff states that this misconduct was done in retaliation for his use of the grievance system. Plaintiff filed a step III appeal asserting that the Regional Medical Officer made changes in his treatment based on budgetary concerns, rather than on Plaintiff's medical needs.

On January 17, 2012, Plaintiff filed another health care request, complaining that he was "suffering." On January 20, 2012, Plaintiff missed his injection because no medication was

available. Plaintiff was told that the doctor would call him later in the day, but Plaintiff was never called out. Plaintiff filed a grievance. On January 22, 2012, Plaintiff attempted to talk to Defendant Berhane about medical treatment. However, Defendant Berhane used "insults, threats and intimidation tactics to force Plaintiff into dropping the subject of medical care."

On January 26, 2012, Plaintiff filed a grievance on Defendants Berhane and Borgerding asserting that they acted with deliberate indifference. Plaintiff also grieved the fact that Defendant Berhane threatened Plaintiff in order to get him to drop his complaints. Plaintiff also filed another health care request, seeking the contact information for the laboratory used by the prison. On February 3, 2012, the step I grievance response reviewed the peaks and troughs of Plaintiff's testosterone levels. On February 15, 2012, Physician's Assistant Matthew Luttrell met with Plaintiff and informed him that he would request that Plaintiff receive daily treatment. On February 23, 2012, Plaintiff filed a Freedom of Information Act (FOIA) request, seeking the contact information for the laboratory used by the prison.

On February 29, 2012, Plaintiff gave durable power of attorney to his father, Francis Richard Mead. On March 8, 2012, Mr. Mead filed a formal FOIA request for laboratory results from Garcia Laboratory. Plaintiff filed a grievance regarding the denial of daily treatment and appealed the rejection / denial of this grievance to step III. On March 10, 2012, Plaintiff was transferred to the Ojibway Correctional Facility (OCF). On March 16, 2012, Defendant Borgerding ended all treatment for Plaintiff's hypogonadism, as well as his prescription for vitamin D. Plaintiff claims that he had been receiving vitamin D because of a deficiency related to low testosterone. Plaintiff claims that this decision was motivated by a desire to retaliate against Plaintiff for filing grievances and that it was a conscious choice to emasculate Plaintiff.

On March 22, 2012, Defendant Asche informed Plaintiff of Defendant Borgerding's decision to defer Plaintiff's treatment. Plaintiff was charged a $5 co-pay, despite the fact that he was not actually examined. Plaintiff requested continued treatment, complaining that he was suffering from pain in his nipples and testicles, to no avail. Plaintiff filed a grievance against Defendants Asche and Ralles asserting a violation of the ADA (Americans with Disabilities Act) and the Eighth Amendment.

On April 4, 2012, Plaintiff was seen by Defendant Ralles for pain in his nipples and testicles. Defendant Ralles examined Plaintiff and concluded that he suffered from "gynocomastca[2]." Defendant Ralles did not examine Plaintiff's testicles. Plaintiff requested continuation on hormone therapy, stating that he was extremely distressed because of his body's failure to function like a normal man. Plaintiff was subsequently seen by a psychologist, who stated that testosterone has nothing to do with depression. Plaintiff filed a grievance.

On April 27, 2012, Plaintiff received a step II response to a grievance regarding the cessation of treatment, which stated that Defendant Borgerding had documented that such treatment was not medically necessary. In addition, it was stated that "no medical services will be provided for preestablished hormonal services prior to incarceration." Plaintiff filed a formal complaint with the Legislative Ombudsman's office, who declined to investigate, stating that medical services were available to Plaintiff at the prison, and that it did not have the medical expertise to challenge the decision of medical professionals. Plaintiff also filed a complaint with the U.S. Department of Justice, who indicated that they did not have the resources to investigate Plaintiff's complaint.

---

[2]The court assumes that Plaintiff intended to say that he suffered from gynecomastia, which is swelling of the breast tissue in boys or men, caused by an imbalance of the hormones estrogen and testosterone. *See* http://www.mayoclinic.com/health/gynecomastia/DS00850.

On October 22, 2012, Plaintiff was seen by Defendant Asche. Plaintiff complained that he was suffering and requested to be placed back on hormone therapy. Defendant Asche asked Plaintiff what his ERD[3] [estrogen-receptor downregulator] level was and Plaintiff responded that it was 2014. Defendant Asche stated that Plaintiff would "make it" without hormone therapy. Defendant Asche did not examine Plaintiff. Plaintiff states that his testicles have atrophied and that he is developing breasts, which have caused sexual predators to make advances toward Plaintiff. Plaintiff contends that he now has to fear for his safety.

Plaintiff states that Defendants have violated his rights under the First, Eighth and Fourteenth Amendments, as well as the ADA. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

## Discussion

I.  Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial

---

[3]Estrogen receptor downregulators, called ERDs for short, block the effects of estrogen in breast tissue. ERDs are used in the prevention and treatment of certain types of breast cancer. *See* http://www.breastcancer.org/treatment/hormonal/erds.

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(I)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Initially, the court notes that Plaintiff has named the Michigan Department of Corrections as a Defendant. Plaintiff may not maintain a § 1983 action against the Michigan Department of Corrections. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v.*

*Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment. *See, e.g.*, *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000). In addition, the State of Michigan (acting through the Michigan Department of Corrections) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)).

Moreover, to state a constitutional claim against Corizon pursuant to 42 U.S.C. § 1983, Plaintiff must specifically allege the existence of a policy, practice, or custom by Corizon that is allegedly unconstitutional. A review of Plaintiff's complaint shows that he has failed to make any such allegations. Accordingly, Plaintiff's claims against Defendant Corizon are properly dismissed. *Ferguson v. Corizon*, 2013 WL 4758196, 7 (E.D. Mich. 2013).

With regard to Plaintiff's claims that individual Defendants were deliberately indifferent to a serious medical need, the court concludes that this claim lacks merit. The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth

Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer*, 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). In this case, Plaintiff has attached voluminous copies of grievances, health care requests, and letters to his complaint, as well as responses to those items. A review of the record reveals that Plaintiff was seen by medical personnel on numerous occasions and had blood draws to monitor his testosterone levels. Plaintiff's complaint is solely with the decision to decrease and eventually discontinue his testosterone injections. On February 15, 2012, Defendant Borgerding noted that Plaintiff's testosterone injections could be decreased from 200 mg every two weeks to 200 mg every four weeks because blood levels two weeks after injection were "mid-range/therapeutic per UpToDate protocol."

Therefore, more frequent injections were not necessary. *See* docket #1-1, p. 54 of 60. On March 16, 2012, Defendant Borgerding noted that Plaintiff's treatment with injectable testosterone was being deferred because "[p]ost puberty testosterone is indicated for treating libido and secondary sex characteristics. Not medically necessary in this case." *See* docket #1-1, p. 59 of 60.

Where, as here, "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). The court concludes that Plaintiff's Eighth Amendment claims against the individual Defendants are properly dismissed.

Plaintiff also claims that Defendants' conduct was motivated by a desire to retaliate against him for his use of the grievance procedure. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir.1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, Plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Filing a grievance is constitutionally protected conduct under the First Amendment. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Noble v. Schmitt*, 87 F.3d 157, 162 (6th Cir. 1996). Plaintiff, however, cannot show that his medical treatment, including the discontinuation of his testosterone injections, was an adverse action taken against him from filing a grievances.

Nor does Plaintiff allege facts showing that Defendants were actually motivated by a desire to retaliate against him. Temporal proximity may be "'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Muhammad v. Close*, 379 F.3d 413, 417-18 (6th Cir. 2004) (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004)). However, "[c]onclusory allegations of temporal proximity are not sufficient to show a retaliatory motive." *Skinner v. Bolden*, 89 F. App'x 579, 580 (6th Cir. 2004).

Moreover, *Muhammad* does not stand for the proposition that temporal proximity alone is sufficient to create an issue of fact as to retaliatory motive.

> In *Muhammad* the Sixth Circuit did not resolve the issue, but merely observed that "temporal proximity alone **may be** 'significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive.'" *Id.* at 418 (quoting *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir.2004) (emphasis added). Even if temporal proximity may in some cases create an issue of fact as to retaliatory motive, it would only be sufficient if the evidence was "significant enough." Plaintiff's conclusory and ambiguous evidence is not "significant enough" to create an issue of fact as to retaliatory motive.

*Brandon v. Bergh*, 2010 WL 188731, slip op. at 1 (W.D. Mich., Jan. 16, 2010). Therefore, the court concludes that Plaintiff's retaliation claims are properly dismissed.

In addition, Plaintiff appears to be asserting that Defendants violated his substantive due process rights. In order to state a viable substantive due process claim premised upon the

- 14 -

arbitrary use of governmental power, plaintiff must show at a minimum that intentional governmental conduct which "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty." *See e.g. United States v. Salerno*, 481 U.S. 739, 746 (1987); *Nobles v. Brown*, 985 F.2d 235, 236-237 (6th Cir. 1992). In the Sixth Circuit, these standards require that plaintiff establish that he has been deprived of a fundamental right and that the defendants were more than simply negligent. *See generally*, *Nobles*, *supra*; *Newell v. Brown*, 981 F.2d 880 (6th Cir. 1992), *cert. denied* 510 U.S. 842 (1993); *Sutton v. Cleveland Board of Education*, 958 F.2d 1339, 1350-1351 (6th Cir. 1992); *Charles v. Baesler*, 910 F.2d 1349 (6th Cir. 1990) (Hillman, sitting by special designation); *see also Nishiyama v. Dickson County*, 814 F.2d 277, 282 (6th Cir. 1987). Plaintiff must show that defendants' conduct was egregious, shocking to the conscience, or otherwise transcending all bounds of reasonable behavior. *Williams v. Smith*, 717 F. Supp. 523 (W.D. Mich. 1989) (Hillman, C.J.). Plaintiff has failed to allege such behavior.

Plaintiff contends that Defendants' conduct deprived him of his rights under the ADA [Americans with Disabilities Act]. Title II of the ADA provides

> . . . that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132 (2000 ed.). A "'qualified individual with a disability'" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). The Act defines "'public entity'" to include "any State or local government" and "any department, agency, . . . or other instrumentality of a State," § 12131(1). [The Supreme Court has] previously held that this term includes state prisons. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

*United States v. Georgia*, 546 U.S. 151, 153-54 (2006). Thus, to state a claim under the ADA, a plaintiff must show that he is "(1) disabled under the statute, (2) otherwise qualified for participation in the program, [services or activities], and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under[,] the program, [services, or activities] by reason of his disability." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008). The MDOC is not necessarily immune from a damages claim under the ADA, because Title II abrogates state sovereign immunity for claims based on "conduct that actually violates the Fourteenth Amendment[.]" *Georgia*, 546 U.S. at 159.

Assuming that Plaintiff's Hypogonadotropic Hypogonadism (HH) is a disability under the ADA, Plaintiff does not allege that he has been discriminated against, or that he has been unable to participate in or receive the benefit of a service, program, or activity available to other inmates by reason of that disability. Instead, Plaintiff merely claims that he was deprived of specific medications, which he had been receiving prior to his incarceration. This claim is properly analyzed under the Eighth Amendment. As noted above, Plaintiff's allegations do not rise to the level of an Eighth Amendment violation. Therefore, the ADA claim will be dismissed.

To the extent that plaintiff is claiming his state law rights were violated, the court will refuse to exercise pendent jurisdiction over such claims. Claims raising issues of state law are best left to determination by the state courts, particularly in the area of prison administration. In addition, pendent jurisdiction over state law claims cannot be exercised after all federal claims have been dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727 (1966); *Smith v. Freland*, 954 F.2d 343, 348 (6th Cir.), *cert. denied*, 504 U.S. 915 (1992).

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $455.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $455.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.


Dated:      1/2/2014                             /s/ R. Allan Edgar
                                                R. Allan Edgar
                                                United States District Judge